BAP Appeal No. 20-43    Docket No. 68    Filed: 12/02/2021    Page:

**FILED**
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

**December 2, 2021**

**Blaine F. Bates**
**Clerk**

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| IN RE STEVEN W. BLOOM, | BAP No. CO-20-043 |
| Debtor. | |
| _____ | |
| GLENCOVE HOLDINGS, LLC, | Bankr. No. 17-11650 |
| Plaintiff - Appellee, | Adv. No. 17-01255-TBM |
| | Chapter 11 |
| v. | |
| STEVEN W. BLOOM, | OPINION |
| Defendant - Appellant. | |

_____

Appeal from the United States Bankruptcy Court
for the District of Colorado

_____

David R. Eason of Eason Law, LLC, Denver, Colorado for Defendant - Appellant Steven W. Bloom

Travis C. Armstrong of Sheehy, Ware & Pappas, P.C., Houston, Texas for Plaintiff - Appellee Glencove Holdings, LLC

_____

Before **SOMERS**, **JACOBVITZ**, and **LOYD**, Bankruptcy Judges.

_____

**JACOBVITZ**, Bankruptcy Judge.

The Debtor is an airplane sales broker who agreed to help a wealthy couple locate and purchase an airplane. The Debtor found a desirable airplane and convinced the couple

to make an offer. When the seller's counteroffer came back lower than expected, the Debtor—without disclosing the seller's identity—lied to the couple about the amount of the counteroffer and told them he was negotiating hard to get the purchase price down. Instead, the Debtor secretly purchased the airplane for a good price through his shell limited liability company, then sold the airplane to the couple's wholly owned company for $250,000 more than his limited liability company paid. The Debtor never disclosed the secret back-to-back transaction, never disclosed his relationship to the shell company, and never disclosed that the seller had refused to perform aircraft maintenance items the Debtor said would be fixed by the seller. After the sale closed, the couple caught wind of the scheme, and the parties sued each other in state court, prompting the Debtor to file bankruptcy in the United States Bankruptcy Court for the District of Colorado. The Debtor's bankruptcy led the couple to file, on behalf of their company, a proof of claim and a nondischargeability complaint. The Debtor appeals the Bankruptcy Court's judgment allowing the claim in the amount of $458,470 and determining the debt to be nondischargeable under § 523(a)(2)(A) and (a)(6).[1]

Because the Bankruptcy Court did not err in any of its findings and conclusions, we affirm.

---

[1] All future references to "Code," "Chapter," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

# I.    BACKGROUND

## A.    Events leading to the parties' execution of the Agent Agreement

Jennifer and Huw Pierce own a private daycare and school business in Houston, Texas. Because of their busy schedules, they considered buying a private jet for travel. Knowing nothing about airplanes, the Pierces engaged an airplane sales broker to help find a jet. The Pierces were not satisfied with that broker's experience and service, and the broker agreement eventually expired. A mutual business acquaintance put the Pierces in touch with the Debtor, who had a long career in aviation as a pilot, aircraft sales manager, and private-jet aircraft broker. The Debtor was the sole owner and manager of Bloom Business Jets, LLC ("BBJ"), a company he formed to buy and sell aircraft.

The Debtor sent the Pierces information about a Raytheon Hawker 800XP (the "Airplane") that was on the market. After the Pierces expressed an interest in the Airplane, the parties signed an Agent Agreement[2] on August 6, 2015 for BBJ's services related to the Airplane. The Debtor signed the Agent Agreement on behalf of BBJ,[3] and Mrs. Pierce signed the Agent Agreement on behalf of an unnamed "assigned corporation." That company turned out to be Glencove Holdings, LLC ("Glencove"), which was formed the

---

[2] Agent Agreement, in Appellant's App. at 1023. The form of the agreement had been developed by Brad Rose, counsel for the Debtor and BBJ.

[3] The Agent Agreement mistakenly listed "Bloom Business Jets, Inc." as a party in the preamble, but the Bankruptcy Court found—and the parties do not dispute on appeal—that BBJ was the intended and actual party to the agreement.

next day.[4] Under the Agent Agreement, BBJ agreed to act as Glencove's sole agent and to use its best efforts to locate an acceptable aircraft, assist in negotiations with the seller, assist in pre-purchase inspections, and provide professional services consistent with industry standards. In exchange, BBJ would receive a fee of $121,000 or 3.75% of the purchase price, whichever was less (the "Agent's Fee"), upon closing the sale.

## B.    The Debtor's misrepresentations regarding negotiations with Loretto, the Airplane's owner

On August 7, 2015, the Debtor emailed the Pierces in preparation for the initial purchase offer, recommending a target acquisition price of $3.6 million and an initial offer in the mid-$3.3 million range. Acting for Glencove, the Debtor then made an offer in the low $3 million range to Loretto Aviation, LLC ("Loretto"), the Airplane's owner. Loretto was not a party to the Agent Agreement and had no obligation to pay Glencove's broker, BBJ, any part of the Agent's Fee. On August 11, 2015, the Debtor received a formal counteroffer of $3.4 million from Loretto. The next day, despite having the $3.4 million offer in hand, the Debtor emailed Glencove that "[o]ur offer came back at $3.775M"[5]—that is, $375,000 above Loretto's real counteroffer. In the same email, the Debtor said that "[o]ur goal is to buy in that Wholesale range $3.665M" and that he would attempt to "get

---

[4] Even though Glencove did not sign the Agent Agreement (because it was not yet formed), the Bankruptcy Court found—and the parties do not dispute on appeal—that Glencove was the intended and actual party to the agreement.

[5] Aug. 12, 2015 email, *in* Appellant's App. at 1035.

4

them down another $75,000 to $90,000" below the fabricated $3.775 million counteroffer.[6] The Debtor never revealed Loretto's identity to Glencove.

Mrs. Pierce—unaware of the Loretto $3.4 million counteroffer—asked the Debtor to negotiate the price down to the $3.5 million to $3.55 million range. The Debtor responded later that evening, stating, "I'm confident we can get them lower. Let's just see where we can get them."[7] Based on the Debtor's recommendations, and still being unaware of Loretto's counteroffer, Mrs. Pierce authorized a new offer of $3,550,000.

On August 13, 2015, the Debtor wrote back with another lie, stating that he was "going back and forth" with the seller and was "negotiating hard" but that the pricing had stalled at $3.595 million.[8] The Debtor also falsely stated, "We are stuck now at this number Seller's not budging off this $3.595M."[9] Eventually, the Debtor told the Pierces that the unnamed seller had accepted Glencove $3.55 million offer.

Meanwhile, on August 14, 2015, the Debtor (who secretly continued to negotiate with Loretto to further reduce the real purchase price) signed a letter of intent with Loretto to buy the Airplane for $3.3 million. The Debtor never told Glencove or the Pierces about any of the lower offers he received from Loretto or the letter of intent.

---

[6] *Id.*

[7] *Id.* at 1036.

[8] Aug. 13, 2015 email, *in* Appellant's App. at 1039.

[9] *Id.*

**C.    The Airplane purchase and secret back-to-back transaction**

The Debtor secretly structured the transaction as a "back-to-back" sale, using Big Horn Exploration, LLC ("Big Horn") as the initial purchaser. The Debtor was the sole owner of Big Horn, which he co-managed with Brad Rose, counsel for the Debtor and BBJ. The Debtor's plan was to have Big Horn purchase the airplane from Loretto for $3.3 million, then immediately re-sell the airplane to Glencove for $3.55 million, a markup of $250,000. The Debtor never informed Glencove that the deal would be structured this way.

On August 25, 2015, the Debtor forwarded to Glencove a proposed Aircraft Purchase and Sale Agreement ("PSA") listing Big Horn as the Airplane's seller. Big Horn, however, did not actually own the aircraft at that time. It was not until August 31, 2015 that Big Horn entered into a separate purchase and sale agreement with Loretto for the Airplane. Actual ownership did not transfer to Big Horn until the closing of the back-to-back sales on September 29, 2015. Unaware of Loretto's involvement in the sale and the Debtor's relationship to Big Horn, the Pierces believed that Big Horn was the Airplane's original owner and seller, so Glencove signed the PSA with Big Horn.

**D.    Glencove's financing of the Airplane purchase**

Glencove needed financing to close on the Airplane purchase. Even before entering into the Agent Agreement with BBJ, the Pierces had engaged Martin Orman of Aircraft Finance Corporation ("AFC") to assist in arranging financing. After previous proposed lenders declined loans to the Pierces, Orman turned to TruStone Financial Credit Union ("TruStone Financial"), which approved a ten-year, $2,591,500 loan (the "Loan") to

6

Glencove on September 28, 2015. Glencove paid AFC its 1% loan origination fee ($25,915) at closing.

**E.    The Debtor's misrepresentations regarding Airplane maintenance**

With the Loretto-Big Horn and Big Horn-Glencove purchase agreements executed, Haggan Aviation ("Haggan")—a company the Debtor selected—conducted a pre-purchase inspection of the Airplane. On September 17, 2015, Haggan issued a work order estimate (the "Original Work Order Estimate") that identified twenty-seven "Airworthy Items" to be repaired before the sale closing at an estimated cost of $67,459. The Debtor sent the Original Work Order Estimate to Mrs. Pierce.

On September 21, 2015, Glencove executed a *Conditional Acceptance Certificate*, agreeing to proceed with the Airplane purchase provided that the seller agreed to make the $67,459 in repairs. Without telling Glencove, and knowing that Loretto was reluctant to make repairs, the Debtor negotiated with Haggan to reduce the amount of airworthy items in its estimate. On September 24, 2015, Haggan issued another work order estimate (the "Revised Work Order Estimate") with fewer repair items, totaling $52,587.19. Glencove did not receive or approve the Revised Work Order Estimate.

On September 25, 2015, Loretto's broker informed the Debtor that Loretto would not perform any repairs to the Airplane and that it was being sold as-is. Rather than disclosing this development to Glencove, the Debtor instead convinced Loretto to pay

$22,000 for some of the airworthiness repairs.[10] On September 28, 2015, when Glencove asked for the status of repairs on the Original Work Order Estimate, the Debtor responded with another fabrication, telling Glencove that the seller would pay for the repairs and that the repairs were underway. In fact, the Debtor knew that not all the repairs on the Original Work Order Estimate would be made. Relying on the Debtor's assurances, Glencove proceeded.

## F.   Closing of Airplane PSA

On September 29, 2015, the escrow company, Insured Aircraft Title Service ("IATS"), finalized the closing documents between Loretto and Big Horn. Loretto transferred the Airplane's title to Big Horn, and Big Horn then flipped the Airplane to Glencove on the same day. Of the $250,000 of "upcharge" proceeds, $29,633.66 went to Rose, $90,000 went to AFC,[11] and $130,366.34 went to BBJ.

## G.   Management Agreement, billing dispute, and resulting state-court litigation

After the sale, Glencove (which was still unaware of the Debtor's misrepresentations) entered into a management services agreement (the "Management

---

[10] Although the Bankruptcy Court's findings on this point are not material to the appeal, the court found that Loretto agreed to pay for $22,000 of repairs after the Debtor alleged malfeasance by Loretto regarding the airworthiness of the Airplane while Loretto owned the Airplane and flew paying passengers on it.

[11] As noted above, based on its agreement with Glencove, AFC was entitled to a $25,915 origination fee from Glencove for helping Glencove secure a loan. Separate and apart from its entitlement to the origination fee from Glencove, AFC apparently was entitled to a "referral fee" from the Debtor since it was Martin Orman of AFC who introduced the Debtor to the Pierces. The record was not clear on whether the $90,000 paid to AFC was inclusive of the $25,915 origination fee paid by Glencove (meaning the referral fee was roughly $64,000), or whether AFC received $25,915 for the origination fee plus a referral fee from the Debtor of $90,000.

8

Agreement"), under which BBJ would crew and manage the Airplane's operations. Glencove terminated the Management Agreement in early May 2016 after growing frustration with what it considered BBJ's false billing practices. In response, BBJ filed a lien against the Airplane in June 2016, asserting unpaid fees under the Management Agreement.

In August 2016, BBJ filed a lawsuit against Glencove in Colorado State Court, Pitkin County, Case No. 2016CV30114, asserting alleged rights under its lien and claiming Glencove breached the Management Agreement. On March 3, 2017, Glencove—which by this point had discovered the Debtor's misrepresentations through its investigations concerning the BBJ lien—filed a counterclaim against BBJ and a third-party complaint against the Debtor, Rose, Big Horn, and Haggan for their actions related to the purchase and management of the aircraft (the "Third-Party Complaint").[12] The Third-Party Complaint alleged seven causes of action against the Debtor for (1) fraud; (2) fraudulent concealment and inducement; (3) negligent misrepresentation; (4) violation of the Colorado Consumer Protection Act; (5) negligence and gross negligence; (6) civil conspiracy; and (7) attorney's fees.

## H.     The bankruptcy filing and Glencove proof of claim

On the same day that Glencove filed its Third-Party Complaint, the Debtor filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of

---

[12] *Defendant Glencove Holdings, LLC's Counterclaim and Third-Party Complaint*, *in* Appellant's App. at 1729.

Colorado.[13] The chapter 13 case later was converted to a case under chapter 11 of the Bankruptcy Code. Glencove filed a proof of claim in the bankruptcy case (the "Proof of Claim"),[14] asserting a claim (the "Claim") of $602,393.91 for the Debtor's "fraud scheme" and attaching a copy of the Third-Party Complaint. The Debtor filed an objection to the Proof of Claim,[15] and the claim-objection contested matter was tried together with the § 523 adversary proceeding (discussed next).

## I.    Adversary proceeding, state-court detour, and trial

On June 19, 2017, Glencove filed an adversary proceeding against the Debtor, seeking a determination that the Debtor's debts to Glencove as described in the Proof of Claim and Third-Party Complaint are not dischargeable under 11 U.S.C. § 523(a)(2) and (6).[16] The Debtor filed an answer, asserting counterclaims for breach of contract, unjust enrichment, punitive damages, and attorney's fees.[17] The Bankruptcy Court later granted Glencove's motion to dismiss the counterclaims.[18]

---

[13] *Voluntary Petition*, No. 17-11650 (Bankr. D. Colo. Mar. 3, 2017), ECF No. 1.

[14] *Proof of Claim*, No. 17-11650, Claim 7-1 (Bankr. D. Colo. June 13, 2017), *in* Appellant's App. at 1725.

[15] *Debtor's Objection to Glencove Holdings, LLC's June 13, 2017 Proof of Claim*, No. 17-11650 (Bankr. D. Colo. July 19, 2017), ECF No. 32.

[16] *Complaint for Determination of Non-Dischargeability of Certain Debts Pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6)*, No. 17-01255 (Bankr. D. Colo. June 19, 2017), ECF No. 1, *in* Appellant App. at 1494.

[17] *Defendant Steven W. Bloom's Answer*, No. 17-01255 (Bankr. D. Colo. July 17, 2017), ECF No. 5.

[18] *Minutes of Proceeding/Minute Order*, No. 17-01255 (Bankr. D. Colo. Sept. 28, 2017), ECF No. 14.

In December 2017, the Bankruptcy Court granted Glencove's motion to modify the automatic stay to allow the Colorado state-court litigation to proceed,[19] and in January 2018, with the agreement of the parties, and based on the significant overlap between the claims in the § 523 adversary proceeding and the claims in the state-court litigation, the Bankruptcy Court entered orders abating the adversary proceeding and the claim-objection contested matter pending resolution of the state-court litigation.[20] After the litigation stalled in state court for nearly two years with little or no progress, the Bankruptcy Court vacated the adversary proceeding abatement order,[21] and the adversary proceeding and claim-objection contested matter were heard together in the Bankruptcy Court during a three-day bench trial commencing on June 22, 2020. The evidence closed on June 24, 2020, and the Bankruptcy Court took the matter under advisement. Both parties submitted post-trial briefing.

On September 10, 2020, the Bankruptcy Court entered its *Memorandum Opinion After Trial* (the "Opinion"), determining that (1) the Debtor committed fraud and fraudulent concealment against Glencove, (2) as a result of this fraud, Glencove suffered $458,470 in damages, and (3) the Debtor's debt for these damages is nondischargeable in bankruptcy

---

[19] *Minutes of Proceeding/Minute Order*, No. 17-11650 (Bankr. D. Colo. Jan. 11, 2018), ECF No. 99.

[20] *Order Holding Adversary Case in Abeyance*, No. 17-01255 (Bankr. D. Colo. Jan. 11, 2018), ECF No. 23; *Order Holding in Abeyance Litigation Regarding Glencove Holding[s], LLC's Proof of Claim and Debtor's Objection Thereto*, No. 17-11650 (Bankr. D. Colo. Jan. 11, 2018), ECF No. 100.

[21] *Order Vacating Abeyance, Setting Trial, and Scheduling Pre-Trial Conference*, No. 17-01255 (Bankr. D. Colo. Dec. 23, 2019), ECF No. 33.

pursuant to 11 U.S.C. § 523(a)(2)(A) and (6).[22] The Bankruptcy Court declined to address Glencove's remaining claims for negligent misrepresentation, violation of the Colorado Consumer Protection Act, negligence and gross negligence, and civil conspiracy:

> Given the Court's foregoing disposition of the fraud by false representation and fraudulent concealment claims (*i.e.*, allowing the Glencove Claim in the amount of $458,470 plus reserving the issue of additional attorneys' fees and costs), the Court need not consider the myriad of other claims against Mr. Bloom. Instead, in the exercise of the Court's discretion, and for purposes of judicial economy and efficiency as well as case administration, the Court declines to adjudicate the additional causes of action against Mr. Bloom asserted in the Glencove Claim. It is enough that the Court already allowed the Glencove Claim on the basis of the fraud and fraudulent concealment causes of action.[23]

In the concluding section of the Opinion, "VI. Final Decision and Judgment," as well as in the Judgment[24] entered the same day, the court (i) allowed the Claim as a nonpriority unsecured claim against the Debtor in the amount of $458,470, plus post-judgment interest and attorney's fees and costs to be assessed; (ii) determined that the Debtor's debt for the Claim, plus post-judgment interest and attorney's fees and costs to be assessed, was nondischargeable under both § 523(a)(2)(A) and (a)(6), and (iii) set a deadline for Glencove to file any request for attorney's fees and costs.

---

[22] *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366 (Bankr. D. Colo. 2020). Curiously, even though the Bankruptcy Court previously dismissed the Debtor's counterclaims, the Bankruptcy Court noted that the Debtor failed to prosecute any counterclaims at trial and dismissed them (again) for failure to prosecute. *Id*. at 377 n.16.

[23] *Id.* at 423.

[24] *Judgment in Favor of Glencove Holdings, LLC and Against Steven W. Bloom*, No. 17-01255 (Bankr. D. Colo. Sept. 10, 2020), ECF No. 78, *in* Appellant's App. at 1692 (the "Judgment").

The Debtor filed a timely notice of appeal of the Bankruptcy Court's decision. After the Debtor filed the notice of appeal, Glencove filed a motion to alter or amend the Judgment, arguing that the Bankruptcy Court failed to award all interest to which Glencove was entitled. The Bankruptcy Court denied that motion, but Glencove did not file a cross-appeal.

## II.    JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[25] The Debtor filed his notice of appeal timely on September 23, 2020, within fourteen days of entry of the Bankruptcy Court's Judgment.[26] Neither party elected to have the district court hear this appeal.

The Opinion and Judgment (i) allowed Glencove's Claim as a nonpriority unsecured claim in the amount of $458,470 (plus postjudgment interest and attorney's fees and costs to be assessed) pursuant to the contested claim-objection contested matter; (ii) determined that the Debtor's debt for the Claim was nondischargeable pursuant to Glencove's § 523(a)(2)(A) and (a)(6) claims asserted in the Adversary Proceeding;[27] and (iii)

---

[25] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[26] *See* Fed. R. Bankr. P. 8002(a)(1).

[27] The Judgment set a deadline for Glencove to seek fees and costs, but "[w]hether the claim for attorney's fees is based on a statute, a contract, or both, the pendency of a ruling on an award for fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal." *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Emps.*, 571 U.S. 177, 179 (2014). No party attempted to invoke Federal Rule of Civil Procedure 58(e) to delay the time to appeal.

13

disallowed the Debtor's counterclaims, to the extent they were not already dismissed. The

Opinion and Judgment thus adjudicated all of the parties' respective claims.[28] Therefore,

this Court has valid appellate jurisdiction over this appeal.

### III.     STANDARDS OF REVIEW

There are different standards of review for the various issues on appeal.

### A.     Agency relationship

The existence of an agency relationship is a question of fact, reviewed for clear

error.[29] "A finding is 'clearly erroneous' when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a

mistake has been committed."[30] If the trial court's account of the evidence is plausible in

---

[28] Although the Bankruptcy Court declined to address Glencove's claims for negligent misrepresentation, violation of the Colorado Consumer Protection Act, negligence and gross negligence, and civil conspiracy, those claims—together with Glencove's fraud and fraudulent-concealment claims—were asserted through the filed Proof of Claim. The Bankruptcy Court fully and finally resolved the claim-objection contested matter by allowing the Claim as a nonpriority unsecured claim in a fixed amount (plus interest and attorney's fees), and the court fully and finally resolved the adversary proceeding by adjudicating Glencove's § 523(a)(2)(A) and (a)(6) claims and the Debtor's counterclaims. *See also Adelman v. Fourth Nat'l Bank and Tr. Co., N.A. (In re Durability, Inc.)*, 893 F.2d 264, 267 (10th Cir. 1990) (noting that "the appropriate 'judicial unit' for application of these finality requirements in bankruptcy is not the overall case, but rather the particular adversary proceeding or discrete controversy pursued within the broader framework cast by the petition").

[29] *In re Kearney*, 625 B.R. 83, 93 (10th Cir. BAP 2021) (findings of fact reviewed for clear error); *Victorio Realty Grp., Inc. v. Ironwood IX*, 713 P.2d 424, 425 (Colo. App. 1985) (noting that the existence of an agency relationship is ordinarily a question of fact, except where there is no dispute in the facts that are alleged to have created the agency, in which case the question of the existence of an agency relationship should be determined by the court as a matter of law).

[30] *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

light of the record viewed in its entirety, a court of appeals may not set aside those findings even though convinced that it would have weighed the evidence differently had it been sitting as the trier of fact.[31] "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[32] When reviewing findings of fact under the clearly-erroneous standard, "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."[33]

## B.    Colorado's Economic-Loss Rule

Whether Colorado's economic-loss rule applies to bar a claim is a question of law, subject to de novo review.[34] Under the de novo standard of review, the appellate court gives no deference to the trial court's decision and applies the same standard as the trial court.[35]

## C.    Damages

A trial court's underlying factual determinations regarding the amount of damages are reviewed for clear error.[36] The Debtor argues that the Bankruptcy Court erred in concluding certain types of damages were allowed under Colorado law. Interpretation of state law is reviewed de novo.[37] Under Colorado law, the trial court has "wide discretion

---

[31] *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985).

[32] *Id.*

[33] Fed. R. Civ. P. 52(a)(6).

[34] *Standard Bank, PLC v. Runge, Inc.*, 443 F. App'x 347, 349 (10th Cir. 2011) (unpublished).

[35] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021).

[36] *Nieto v. Kapoor*, 268 F.3d 1208, 1221 (10th Cir. 2001).

[37] *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("We conclude that a court of appeals should review *de novo* a district court's determination of state law.").

in fixing the measure and amount of damages."[38] To the extent the trial court is exercising

discretion, the exercise of that discretion reviewed for abuse of discretion. Under the abuse-

of-discretion standard of review, a trial court's decision will not be disturbed unless the

trial court's decision manifests a clear error in judgment by exceeding the bounds of

permissible choice in the circumstances. [39]

## D.     Dischargeability of Debt Under § 523(a)(2)(A) and (a)(6)

A bankruptcy court's interpretation of § 523(a)(2)(A) and (a)(6) is reviewed de

novo, but to the extent review involves the sufficiency of the evidence, appellate courts

review for clear error.[40] Factual findings concerning intent, misrepresentation, false

pretenses, concealment, justifiable reliance, willfulness and malice, injury, and causation

are reviewed for clear error.[41]

---

[38] *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994) (citing *Bigler v. Richards*, 377 P.2d 552, 553 (Colo. 1963)).

[39] *See Lang v. Lang (In re Lang)*, 305 B.R. 905, 908 (10th Cir. BAP 2004) (explaining the abuse of discretion standard of review further), *aff'd,* 414 F.3d 1191 (10th Cir. 2005).

[40] *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 685 (10th Cir. BAP 2013) ("The interpretation of a statute and its requirements is a legal issue that is reviewed de novo.").

[41] *See, e.g.*, *Montgomery Bank, N.A. v Steger (In re Steger)*, 472 B.R. 533, 536 (8th Cir. BAP 2012); *Kane v. Stewart Tilghman Fox & Bianci, P.A . (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2014) (the question of willfulness and malice is one of fact that is reviewed for clear error); *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 919 (10th Cir. BAP 2010) (factual findings concerning justifiable reliance reviewed for clear error); *First Nat'l Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 672 (10th Cir. BAP 2005) ("A bankruptcy court's factual findings, including those concerning intent and reasonable reliance, are subject to review under a clearly erroneous standard."), *aff'd,* No. 05-6225, 2006 WL 1875366 (10th Cir. July 7, 2006).

## E.    Reasonable Reliance

A trial court's factual findings concerning the reasonable reliance element of the tort of fraud under Colorado law are subject to review under the clearly erroneous standard.[42]

## F.    Duty to Disclose Facts

"Whether a defendant has a duty to disclose a particular fact is a question of law reviewed de novo.[43] A bankruptcy court's factual findings regarding nondisclosure are reviewed for clear error.[44]

## G.    Exclusion of Evidence

The Debtor argues that the Bankruptcy Court excluded relevant evidence when finding that the Debtor acted with malice. This Court reviews a bankruptcy court's exclusion of evidence at trial under an abuse-of-discretion standard.[45] Reversible error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right is affected.[46] The test is not met where the evidence refused admission does not add

---

[42] *Mascio v. Gronewoller (In re Mascio)*, 454 B.R. 146, 151, 153 (D. Colo. 2011) (applying clearly-erroneous standard of review to bankruptcy court's factual findings for fraud claim that creditor reasonably relied on debtor's various representations).

[43] *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991); *Berger v. Sec. Pac. Info. Sys., Inc*., 795 P.2d 1380, 1383 (Colo. App. 1990).

[44] *Keys Youth Servs., Inc. v. City of Olathe, KS*, 248 F.3d 1267, 1274 (10th Cir. 2001).

[45] *See Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1242-44 (10th Cir. 2000).

[46] *See Thweatt v. Ontko*, 814 F.2d 1466, 1471 (10th Cir. 1987).

17

anything of probative value beyond the evidence already admitted and would not have changed the outcome of trial.[47]

## IV.    PRELIMINARY MATTER – GLENCOVE'S MOTION TO EXCLUDE

Glencove filed a motion (the "Motion to Exclude")[48] to exclude from the appellate record ten trial exhibits listed in the Debtor's designation of the record because the Bankruptcy Court did not admit the exhibits at trial. After the Debtor responded, a BAP motions panel referred Glencove's motion to the merits panel assigned to the appeal. Now that the matter is before us, we deny the Motion to Exclude.

Bankruptcy Rule 8009(e) governs corrections or modifications to the record on appeal. Rule 8009(e) states:

(e) Correcting or modifying the record

(1) Submitting to the Bankruptcy Court. If any difference arises about whether the record accurately discloses what occurred in the bankruptcy court, the difference must be submitted to and settled by the bankruptcy court and the record conformed accordingly. If an item has been improperly designated as part of the record on appeal, a party may move to strike that item.

(2) Correcting in Other Ways. If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected, and a supplemental record may be certified and transmitted:

---

[47] *See Sims Consol., Ltd. v. Irrigation & Power Equip., Inc.*, 518 F.2d 413, 418 (10th Cir. 1975); *see also Hill v. J.B. Hunt Transp., Inc*., 815 F.3d 651, 659 (10th Cir. 2016) (noting that an error affecting a substantial right of a party is an error that had a substantial influence or that leaves one in grave doubt—after reviewing the record as a whole—as to whether it had such an effect on the outcome).

[48] *Appellee Glencove Holdings, LLC's Objection to and Motion to Exclude Trial Exhibits Identified in Appellant's Designation of Record on Appeal*, BAP ECF No. 25.

(A) on stipulation of the parties;
(B) by the bankruptcy court before or after the record has been forwarded; or
(C) by the court where the appeal is pending.

(3) Remaining Questions. All other questions as to the form and content of the record must be presented to the court where the appeal is pending.[49]

The Debtor initially argues that the Motion to Exclude should be directed to the Bankruptcy Court in the first instance because Rule 8009(e)(1) has a specific reference to motions to strike improperly designated items under the heading, "*Submitting to the Bankruptcy Court.*"[50] But Bankruptcy Rule 8009(e)(1) also refers to matters being submitted to the bankruptcy court when there is a dispute about whether the record accurately discloses what occurred there.

In this case, there is no dispute about whether the record accurately discloses what occurred in the Bankruptcy Court. Both parties agree that the Bankruptcy Court excluded certain exhibits from the evidence, and the issue on appeal is whether the court erred in excluding that evidence.

---

[49] Fed. R. Bankr. P. 8009(e).

[50] Fed. R. Bankr. P. 8009(e)(1). Some opinions support the Debtor's position. *See In re Fundamental Long Term Care, Inc.*, No. 8:11-BK-22258-MGW, 2019 WL 5653449, at *7 (M.D. Fla. Oct. 31, 2019) ("Rule 8009(e)(1) 'leaves no doubt that any dispute over designation of items must be adjudicated by the bankruptcy court, and not the district court to which the appeal has been assigned.' The authority to strike items from a record on appeal or a statement of issues rests within the bankruptcy court's jurisdiction.") (quoting *In re Digerati Techs., Inc.*, 531 B.R. 654, 659 (Bankr. S.D. Tex. 2015)); *Balke v. Carmichael*, No. CV H-18-731, 2018 WL 3328018, at *2 (S.D. Tex. July 6, 2018) (same).

Bankruptcy Rule 8009(e)(2) allows the court where the appeal is pending to correct any "omission or misstatement" in the appellate record,[51] and Bankruptcy Rule 8009(e)(3) requires the court where the appeal is pending to resolve "[a]ll other questions as to the form and content of the record."[52] The Court concludes that subsection (e)(3) permits this Court to resolve the Motion to Exclude.[53] Under Bankruptcy Rule 8009(e)(1), bankruptcy courts may have authority to decide certain motions also—when they allege that an item has been "improperly designated"—but that does not limit our authority to decide the Motion to Exclude in this case under subsection (e)(3).

With the authority to resolve the matter, the Court denies the Motion to Exclude on the merits. This Court cannot determine whether the Bankruptcy Court erred in excluding the exhibits unless they are available for review. As a prior BAP opinion noted, "We find no error in including a document in a record on appeal for the purpose of arguing that the Bankruptcy Court erred in excluding it."[54]

For these reasons, the Court denies the Motion to Exclude.

---

[51] Fed. R. Bankr. P. 8009(e)(2)(C).

[52] Fed. R. Bankr. P. 8009(e)(3).

[53] After the Debtor objected to the Motion to Exclude, Glencove filed a motion to exclude with the Bankruptcy Court as well. *Objection to and Motion to Exclude Trial Exhibits Identified in Appellant's Designation of Record on Appeal*, No. 17-01255 (Bankr. D. Colo. Dec. 9, 2020), ECF No. 106. The Bankruptcy Court abated ruling on the matter pending this Court's ruling on the Motion to Exclude. *Order Holding in Abeyance Glencove Holdings, LLC's Motion to Exclude Trial Exhibits Designated by Steven W. Bloom in his Designation of Record on Appeal*, No. 17-01255 (Bankr. D. Colo. Dec. 30, 2020), ECF No. 111.

[54] *Brasher v. Turner (In re Turner)*, 266 B.R. 491, 498 (10th Cir. BAP 2001).

## V.     DISCUSSION

Determining whether a debt is nondischargeable under § 523(a) is a two-step process. First, the creditor must show that it has an enforceable claim against the debtor under applicable nonbankruptcy law. If that showing is made, then the creditor must show that the debtor's debt for that claim is nondischargeable under § 523(a).[55]

The Bankruptcy Court first allowed the Claim as a nonpriority unsecured claim against the Debtor in the amount of $458,470, plus postjudgment interest and attorney's fees and costs to be assessed. The Bankruptcy Court then determined that the Debtor's debt for the Claim, plus postjudgment interest and attorney's fees and costs to be assessed, was nondischargeable under both § 523(a)(2)(A) and § 523(a)(6). For the reasons described below, the Bankruptcy Court did not err in any of its findings and conclusions.

### A.     The Bankruptcy Court did not err by allowing the Claim based on the Debtor's fraud and fraudulent concealment

The Bankruptcy Court heard the claim-objection contested matter together with the § 523 adversary proceeding. Glencove's underlying claims were asserted through its filed Proof of Claim. A claim filed by a creditor is deemed allowed unless a party-in-interest objects.[56] When it meets the formal requirements of Bankruptcy Rule 3001, a proof of claim constitutes "prima facie evidence of the validity and amount of the claim."[57] If an objection is made to the proof of claim, the creditor has the ultimate burden of persuasion

---

[55] *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2016).

[56] 11 U.S.C. §§ 501, 502(a).

[57] Fed. R. Bankr. P. 3001(f).

as to the validity and amount of the claim.[58] Glencove prevailed below by proving the validity and amount of its Claim.

On appeal, the Debtor challenges the allowance of the Claim on three primary grounds. First, the Debtor argues that the terms of the Agent Agreement preclude an agency relationship between him and Glencove. The Debtor thereby attacks (i) the Bankruptcy Court's fraud determination that Glencove reasonably relied on the Debtor's misrepresentations (in part) because the Debtor was Glencove's agent, and (ii) the Bankruptcy Court's fraudulent-concealment determination that the Debtor had a duty to disclose the concealed facts (in part) because the Debtor was Glencove's agent. Second, the Debtor argues that the Bankruptcy Court erred in awarding certain damages to Glencove. Third, the Debtor argues that the economic-loss doctrine bars Glencove's fraud and fraudulent-concealment claims against him. The Debtor's arguments have no merit.

### 1.     Preliminary matter:  credibility findings by the Bankruptcy Court

At trial, the Bankruptcy Court received key testimony from Huw Pierce, Jennifer Pierce, and the Debtor. Given the importance of their testimony, the Court made specific credibility determinations. The Bankruptcy Court found that the testimony of both Huw Pierce and Jennifer Pierce was credible and, to a significant degree, was directly corroborated by documentation admitted into evidence. On the other hand, the Bankruptcy

---

[58] *Agricredit Corp. v. Harrison (In re Harrison)*, 987 F.2d 677, 680 (10th Cir. 1993); *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002).

Court determined that "Mr. Bloom was not credible at all,"[59] and he further hurt his

credibility by arguing absurdities:

> For example, on August 13, 2015, in an email to Glencove, Mr. Bloom
> painted a picture of hard-fought negotiations with the owner of the Airplane
> on Glencove's behalf. He wrote: "We are going back and forth right now and
> have been for the last three hours We've gotten close on the numbers . . . .
> I'm negotiating hard. [R]ight now I'm working them over . . . ." At trial,
> including in closing arguments, Mr. Bloom tried to explain away these
> damning statements by suggesting that he was negotiating for Glencove
> against Big Horn Exploration (not Loretto Aviation). But, Mr. Bloom owns
> and controls Big Horn Exploration. So, Mr. Bloom's preposterous argument
> is that he was effectively negotiating hard against himself for three hours. By
> presenting that sort of absurdity to the Court, Mr. Bloom undercut his
> position and left his credibility is tatters. Other examples of Mr. Bloom's
> revisionist history and attempts at misdirection abound.[60]

With those credibility findings in mind, the Court now turns to the merits of Glencove's

state law claims.

### 2.    *Glencove proved the elements of fraud*

To establish fraud in Colorado based on a misrepresentation, the plaintiff must show

(1) the defendant made a false representation of a material fact; (2) the defendant knew the

representation was false; (3) the plaintiff was ignorant of the falsity; (4) the defendant made

the representation with the intention that it be acted upon; and (5) the plaintiff actually and

reasonably relied on the representation, causing damages.[61] On appeal, the Debtor

challenges only the fifth element, including reasonable reliance and damages.

---

[59] *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366, 402 (Bankr. D. Colo. 2020).

[60] *Id.* at 402-03 (internal citations omitted).

[61] *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).

### a)    The Debtor made numerous material misrepresentations to Glencove

The Bankruptcy Court found that the Debtor made numerous material misrepresentations to Glencove concerning the Airplane, knowing the representations were false and intending Glencove to act on them, all as part of a scheme to make an extra $250,000 at Glencove's expense through an undisclosed back-to-back Airplane sale. Those false representations include (to name a few): the identity of the original seller of the Airplane, the amount of Loretto's counteroffer for the Airplane, the status of negotiations concerning the Airplane, the amount of maintenance required to make the Airplane airworthy, the status of repairs on the Airplane, and the willingness of Loretto to pay for the repairs. As the Bankruptcy Court found, "For the most part, in his testimony, Mr. Bloom did not attempt to contest, explain, or even address the myriad of False Representations. Instead, he merely seemed content with suggesting that his fraudulent conduct was acceptable."[62] None of the Bankruptcy Court's findings regarding false representations are clearly erroneous, and the Debtor does not argue otherwise on appeal.

### b)    Glencove was ignorant of the falsity of the Debtor's representations

The Bankruptcy Court next found that Glencove was ignorant of the falsity of the Debtor's representations, and the Debtor does not argue otherwise on appeal. That finding is not clearly erroneous.

---

[62] *In re Bloom*, 622 B.R. at 407.

c) **Glencove actually and reasonably relied on the Debtor's misrepresentations**

Turning to reliance, the Bankruptcy Court found that Glencove actually and reasonably relied on the Debtor's misrepresentations for two reasons. First, Glencove actually and reasonably relied on the Debtor's misrepresentations because of the Debtor's words and conduct. On the one hand, the Pierces were unfamiliar with airplanes and the aviation industry and—especially given their lack of confidence in their prior broker—needed somebody they could trust with the skill and experience to help them purchase an airplane. On the other hand, the Debtor had decades of experience in the aviation industry and had convinced the Pierces to form Glencove to sign the Agent Agreement with BBJ based on the Debtor's credentials.

Second, the Bankruptcy Court found that Glencove actually and reasonably relied on the Debtor's misrepresentations because the Debtor was Glencove's agent. Under Colorado law, "[a]n agency relationship need not be contractual, and may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their relation."[63] "What is critical is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency[.]"[64] The existence of an agency relationship can be proven by the parties' conduct.[65] Unless

---

[63] *Am. Family Mut. Ins. Co. v. Tamko Bldg. Products, Inc.*, 178 F. Supp. 3d 1121, 1126 n.3 (D. Colo. 2016) (internal citation omitted).

[64] *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987).

[65] *Moses v. Diocese of Colo.*, 863 P.2d 310, 324 (Colo. 1993).

otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.[66]

The Bankruptcy Court concluded that the Debtor was Glencove's agent even though he is not a party to the Agent Agreement. The Bankruptcy Court found that the Debtor undertook the role to act for and represent Glencove with respect to the Airplane acquisition and repeatedly held himself out to be Glencove's agent, orally and in writing. The Pierces likewise thought that the Debtor was Glencove's agent in the same way as a real estate agent. And the Debtor confirmed as much through his communications with Glencove, where he convinced Glencove that he was acting on its behalf by using the words "our," "us," and "we" in referring to his supposed efforts to help Glencove: "our buy number goal"; "our offer"; "our goal"; "this will put us on the lower end"; "we need to get them down"; "we will need to transfer the deposit"; and "our next counter offer."[67]

The Bankruptcy Court also noted that even Mr. Bloom's testimony at trial effectively establishes the manifestation of consent to agency and his agent role. He stated:

> Q. Now, Mr. Bloom, you understood, didn't you, that Glencove was relying on you to give them the guidance they needed in order to make their purchasing decision with respect to the aircraft. That was the whole purpose of engaging with them, right?
>
> A. Yes.
>
> Q. And you understood that it would be important in that context for you to be honest in communications with them?
>
> A. Yes.

---

[66] *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 491-93 (Colo. 1989).

[67] *See In re Bloom*, 622 B.R. at 402 (citing evidence).

26

Q. And the whole purpose of getting Glencove and the Pierces to sign off on the agent agreement was so that you could go out and talk to the Fred Cei's of the world [Loretto Aviation's agent] and try and find a plane that they would have an interest in buying and then negotiate a sales price for that plane, right?

A. Correct.[68]

Finally, the Bankruptcy Court noted, (i) in his *Answer* (which he has never amended), the Debtor repeatedly characterized himself as an independent agent for Glencove,[69] and (ii) the Debtor's own expert witness, Jason Zilberbrand, conceded the existence of an agency relationship.[70]

The Debtor argues that he was not Glencove's agent and thus contests the Bankruptcy Court's finding that Glencove reasonably relied on the Debtor's misrepresentations (in part) because of his status as agent. That argument fails.

First and foremost, the Debtor still is liable for fraud (and, as discussed below, fraudulent concealment) even if he was not Glencove's agent. In connection with the fraud claim, the Bankruptcy Court found that the Debtor enticed Glencove to rely on him through his words and conduct. There is ample support in the record to support the Bankruptcy Court's finding that it was reasonable for Glencove to rely on the Debtor's misrepresentations given his words and conduct (separate and apart from any agency

---

[68] June 22, 2020 Hr'g Tr., *in* Appellant's App. at 822.

[69] *Defendant Steven W. Bloom's Answer* at 5-6, No. 17-01255 (Bankr. July 17, 2017), ECF No. 5.

[70] The testimony of the Debtor and Zilberbrand on this point could be construed to refer to the Debtor in his capacity as manager or president of BBJ, but even aside from this testimony, the other evidence supports the Bankruptcy Court's finding of an agency relationship.

relationship). The Bankruptcy Court's agency finding is not required to hold the Debtor liable for fraud. The Bankruptcy Court's agency determination simply gives rise to a separate, alternative ground to affirm the Debtor's liability for that claim.

Second, even if Glencove's fraud claim required an agency relationship, the Bankruptcy court did not err in concluding that the Agent Agreement does not preclude the Debtor from being Glencove's agent. The Debtor points to language in Article 9 of the Agent Agreement under the heading, No Employer Relationship, which provides in part,

> AGENT's relationship with BUYER is that of an independent AGENT, and nothing in the Agreement is intended to or should be construed to; create a partnership, agency, joint venture or employment relationship.[71]

The Debtor argues that he cannot be Glencove's agent because this provision (for convenience, the "No-Employer-Relationship Provision") disclaims an agency relationship. The Debtor is not a party to the Agent Agreement, so the disclaimer has nothing to do with him. But even if the Bankruptcy Court looked to the Agent Agreement for guidance in determining the Debtor's relationship with Glencove, the court was correct to conclude that the agreement must be read as a whole.[72] This single-sentence agency disclaimer cannot override the multiple other times the agreement uses the term "agent." Instead, the Bankruptcy Court correctly concluded that the provision appears to be an inartful attempt to disclaim an employer relationship.

---

[71] Agent Agreement Art. 9, *in* Appellant's App. at 1025.

[72] *Town of Estes Park v. N. Colo. Water Conservancy Dist.*, 677 P.2d 320, 326 (Colo. 1984) (noting that the court should "give effect to the intent of the parties" as evidenced by the language of the instrument and must construe the contract "as a whole," giving effect to "every provision, if possible.").

28

The Debtor also argues that because he is an "independent" agent under the No-Employer-Relationship Provision, he is a "transaction broker" with no duties to Glencove, and he is free to act on his own account and to choose the means by which to accomplish the Agent Agreement's objectives. The Bankruptcy Court correctly and flatly rejected this argument. The Bankruptcy Court concluded that the No-Employer-Relationship Provision simply disclaimed an employment relationship and that the term "transaction broker" was a real estate term that had no application whatsoever to the parties and the aviation industry. Moreover, the Bankruptcy Court noted that to say someone is an "independent agent" does not mean such person is no longer an agent.[73] The Agent Agreement also provided: "AGENT [BBJ] will assist BUYER [Glencove] on a sole and exclusive basis" in locating and purchasing [an airplane]."[74] Article 3 likewise provided that "BUYER [Glencove] [will] [u]se the brokerage services of AGENT [BBJ] on a sole and exclusive basis during the term of this Agreement."[75] BBJ and the Debtor in fact acted as Glencove's agent in the transaction, purportedly negotiating with the seller on Glencove's behalf. Neither BBJ nor the Debtor acted on behalf of or for the benefit the seller.

In perhaps the Debtor's strongest contract argument, the Debtor asserts that because Glencove agreed that BBJ would assist it "on a sole and exclusive basis," Glencove could

---

[73] *See RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-CV-01301-PAB-GPG, 2018 WL 1535509, at *7 (D. Colo. Mar. 29, 2018) (noting that the terms "agent" and "independent contractor" are not necessarily mutually exclusive and that independent agents can still have fiduciary duties).

[74] Agent Agreement Art. 1, *in* Appellant's App. at 1023.

[75] Agent Agreement Art. 3.A, *in* Appellant's App. at 1024.

29

not possibly have intended to use the Debtor as its agent as well. Glencove argues in response that this language is really an agency disclaimer, which Colorado courts have determined does not control the agency issue but instead is merely one factor to consider.[76] Although the Agent Agreement's exclusivity provision is not technically an agency disclaimer, the Bankruptcy Court did not err by determining that the contract language was not controlling under these unique circumstances, especially given all the other factors pointing to an agency relationship in fact. Given the Debtor's words and conduct, including his repeated admissions in Bankruptcy Court pleadings that he was Glencove's agent, the Bankruptcy Court did not err in determining that the Debtor was Glencove's agent.

For all of these reasons, it was entirely reasonable for the Pierces and Glencove to rely on the Debtor and his misrepresentations, and they did so.

### d)     Glencove suffered $458,470 in damages

Finally, the Bankruptcy Court awarded $458,470 in damages to Glencove,[77] an award the Debtor challenges on appeal. Under Colorado law, the defrauded party may

---

[76] *RCHFU, LLC*, 2018 WL 1535509, at *7); *see also Bayview Loan Servicing, LLC v. Boland*, 727 F. Supp. 2d 1065, 1074 (D. Colo. 2010) ("[T]he disclaimer . . . is not determinative of whether an agency relationship, in fact, exists."); *Highline Capital Corp. v. Ahdoot*, Nos. 06-cv-02023-EWN-CBS, 2008 WL 486019, at *8 (D. Colo. Feb. 20, 2008) (noting that "even in cases in which the alleged principals and agents *themselves* disclaim the existence of an agency relationship, courts routinely find such disclaimers only weakly probative of whether such relationships in fact exist.") (citing cases).

[77] Glencove also requested an award of attorney's fees and costs, but the parties agreed to reserve that issue for further proceedings.

recover such damages as are a natural and proximate consequence of the fraud.[78]

Compensatory damages are awarded "to make the injured party whole."[79] Frequently, the

measure of damages for fraud is based on "out-of-pocket costs" or "benefit of the bargain"

damages.[80] However, "[t]he trial court, as trier of fact, has wide discretion in fixing the

measure and amount of damages."[81] If the legal injury "is of an economic character . . .

legal redress in the form of compensation should be equal to the injury."[82] Glencove bears

the burden to "provide a reasonable basis for computation so as to enable the fact-finder to

arrive at a fair approximation of the loss sustained."[83]

The Bankruptcy Court's damages award for the allowed Claim had the following

components:

- $250,000—the difference between what Glencove actually paid for the Airplane because of the Debtor's deceit ($3,550,000) and what it should have paid ($3,300,000);

---

[78] *Trimble v. City and Cty. Of Denver*, 697 P.2d 716, 724 (Colo. 1985) (superseded by statute on other grounds); *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677–78 (Colo. 1994) ("[R]ecovery in fraud is only allowed to the extent that the value of the contractual benefits conferred falls short of the value as represented, plus any other damages naturally and proximately caused by the misrepresentation."); *Russell v. First Am. Mortg. Co.*, 565 P.2d 972, 974 (Colo. 1977) ("Regardless of the effect, if any, that a defendant's fraud has on property value, the defrauded party may recover any additional damages which are a natural and proximate consequence of the defendant's misrepresentations.").

[79] *Ballow*, 878 P.2d at 677.

[80] *See Associated Mortg. Corp. v. Weaver (In re Weaver)*, 579 B.R. 865, 905-07 (Bankr. D. Colo. 2018) (explaining Colorado state law on damages for fraud); *W. Cities Broad., Inc. v. Schueller*, 830 P.2d 1074, 1077 (Colo. App. 1991) (referring to fraud damages for "the benefit of the claimant's bargain"), *aff'd* 849 P.2d 44 (Colo. 1993).

[81] *Ballow*, 878 P.2d at 677 (citing *Bigler v. Richards*, 377 P.2d 552, 553 (Colo. 1963)).

[82] *Dep't of Health v. Donahue*, 690 P.2d 243, 250 (Colo. 1984).

[83] *W. Cities*, 830 P.2d at 1077 (citing *Tull v. Gundersons, Inc.*, 709 P.2d 940 (Colo. 1985)).

- $120,000—the Agent's Fee Glencove paid to BBJ. The Bankruptcy Court in effect found that Glencove was entitled to recover the $120,000 Agent's Fee as damages because (i) as a proximate consequence of the Debtor's fraud, Glencove paid a commission to which BBJ was not entitled due to the Debtor's misconduct, and (ii) Glencove would not have purchased the Airplane, and therefore would not have incurred the Agent's Fee, if it had known about the Debtor's fraud.

- $29,947—for maintenance and repair items identified in the Original Work Order Estimate that were not performed. The Bankruptcy Court concluded that this sum is recoverable from the Debtor because he misled Glencove into closing the acquisition knowing such repairs would not be completed;[84]

- $2,500—for a portion of the origination fee paid to AFC for the Loan;[85]

- $211—for a portion of the lender fee paid to TruStone Financial for the Loan;[86] and

- $55,812—for the extra interest paid on $250,000 of the TruStone Loan.

---

[84] Glencove had requested an award of $67,835 for maintenance and repair items identified on the Original Work Order Estimate that were not performed. But because Haggan did eventually perform $37,888 of the repairs, the Bankruptcy Court subtracted that amount from the damages requested ($67,835), leaving net damages for unperformed airworthy repairs of $29,947.

[85] Glencove had requested an award of the entire $25,915 origination fee paid by Glencove to AFC, which Glencove calculated based on its agreement to pay a one percent (1%) origination fee to the company. The Bankruptcy Court found, however, that Glencove should recover only the portion of the origination fee attributable to the extra $250,000 caused by the Debtor's fraud, and not the entire origination fee. "Since Aircraft Finance Corporation did assist in obtaining the $2,591,500 Loan, the recovery against Mr. Bloom must be limited only to the origination fee charged for the $250,000 portion of the Loan caused by Mr. Bloom's fraud (i.e., one percent (1%) of $250,000). That amount is $2,500, not $25,915." *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366, 412 (Bankr. D. Colo. 2020).

[86] Glencove had requested an award of the entire $2,194 lender fee charged by TruStone Financial. But the court awarded only $211, which was the portion of the fee attributable to the extra $250,000 of the Loan caused by the Debtor's fraud. The court calculated the amount by multiplying the $2,194 lender fee by 9.6% (which is the ratio that $250,000 bears to the total Loan).

32

All of these damages represent a fair approximation of the loss sustained by Glencove. Undeterred, the Debtor challenges the damages award on several grounds. All of those arguments fail.

First, the Debtor cites a line of cases for the proposition that a party claiming to have been fraudulently induced to purchase property may disaffirm and rescind the transaction, or affirm and sue for damages in tort, but not both.[87] Glencove has no contract with the Debtor to rescind, so it is difficult to fathom how cases discussing rescission apply to Glencove's claims against the Debtor. Instead, the Bankruptcy Court, as the trier of fact, had wide discretion in fixing the measure and amount of damages in order to make the injured party whole.[88]

Second, according to the Debtor, benefit-of-the-bargain is the exclusive measure of damages if the transaction is not rescinded. The Debtor argues that Glencove was not damaged by the $250,000 purchase price upcharge because the Airplane had a fair market value of $3.55 million, so Glencove got what it paid for—that is, it got the benefit of its bargain by paying $3.55 million for something with a fair market value of $3.55 million. This argument fails on two levels. As an initial matter, the fair market value of the Airplane is irrelevant to Glencove's $250,000 damage claim. The Debtor damaged Glencove by fraudulently preventing Glencove from acquiring the Airplane for the price at which Loretto was willing to sell it to Glencove, whether that price was below, at, or above fair

---

[87] Appellant's Br. at 38 (citing *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 48 (Colo. 1993) and *Joyce v. Davis*, 539 F.2d 1262, 1266 (10th Cir. 1976)).

[88] *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994).

market value. Moreover, even if fair market value were relevant, which it is not, the Debtor's economic argument falls flat. Courts in different contexts have determined that fair market value is the price at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms' length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[89] There is *direct* evidence that $ 3.3 million was the fair market value of the Airplane on September 29, 2015, the date Glencove purchased it:  That evidence is the arms' length sale on the same date between Loretto, the Airplane's prior owner, and Big Horn, which is owned and controlled by the Debtor, who has decades of experience in aviation and airplane sales.[90] That sale between parties with aviation experience is the best possible evidence of the fair market value of the Airplane on September 29, 2015. The $3.55 million sale between Glencove and Big Horn, on the other hand, was not at arms' length, and only one party (Big Horn) had knowledge of the relevant facts. The Debtor actively concealed from Glencove—which had no aviation experience—highly relevant facts related to the value of the Airplane, including the actual Loretto offers.

---

[89] *Est. of True v. Comm'r*, 390 F.3d 1210, 1217 (10th Cir. 2004) (method of valuing, for gift tax purposes, restricted interests in partnership); *Armstrong v. Sabin*, No. 2:20-CV-261-TS-DAO, 2021 WL 3473256, at *7 (D. Utah Aug. 6, 2021) (value of interest in LLC).

[90] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1167 (10th Cir. 2000) ("While expert testimony based on hypothesis can (and sometimes must) be used to establish market value, courts tend to prefer evidence derived from actual sales.").

Third, the Debtor argues that under the benefit-of-the-bargain rule, Glencove cannot recover the partial loan origination fee (paid to AFC), the partial lender fee (paid to TruStone Financial), or the additional interest because Glencove's recovery is limited to out-of-pocket expenses.[91] The Bankruptcy Court limited damages for the partial origination fee, the partial lender fee, and the additional interest to the portion of the fees and interest attributable to the $250,000 increase in the purchase price caused by the Debtor's fraud. Those damages are a natural and proximate consequence of the Debtor's misrepresentations. The Bankruptcy Court did not err by awarding those damages.

Fourth, the Debtor argues that Glencove cannot recover the Agent's Fee for two reasons: first, disgorgement of a broker's commission is a remedy for breach of fiduciary duty, not fraud; and second, Glencove would be overcompensated if it were awarded that fee. Neither argument has merit.

The Debtor's first argument contesting the Agent's Fee as recoverable damages fails. Damages in the amount of the Agent's Fee paid to BBJ does not constitute disgorgement. The Bankruptcy Court did not order BBJ to disgorge the fee.

The Debtor's second argument contesting the Agent's Fee as recoverable damages likewise fails. According to the Debtor, Glencove will be overcompensated by a damages award in the amount of the Agent's Fee because had there been no fraud, Glencove would have paid the Agent's Fee to acquire the Airplane for $3.3 million. Under the Debtor's logic, Glencove has already recouped its $250,000 loss by getting a fraud award in that

---

[91] Appellant's Br. at 39 (citing *Stamp v. Rippe*, 483 P.2d 420, 422-23 (Colo. App. 1971); *Wagner v. Dan Unfug Motors, Inc.*, 529 P.2d 656, 659 (Colo. App. 1974)).

35

amount. The Debtor's argument has superficial appeal, but upon closer examination, it is not persuasive. Colorado appellate court opinions recognize, "In an action for fraud in the sale of personal property, when the 'benefit of the bargain rule' does not make a defrauded party whole, additional damages are allowable for expenses which flow as a natural and ordinary consequence of the original wrong."[92] In Colorado, when a broker commits a breach of fiduciary duty while acting as an agent, the broker forfeits his commission on the basis of unjust enrichment.[93] BBJ did not earn its Agent's Fee because BBJ charged Glencove a $120,000 Agent's Fee for fraudulent services rendered. Therefore, the Debtor's fraud was the proximate cause of Glencove paying the Agent's Fee it did not owe. The award of damages to Glencove in the amount of the Agent's Fee was necessary to make Glencove whole.

Finally, the Debtor argues that Glencove cannot recover $29,947 for maintenance and repair items identified in the Original Work Order Estimate that were not performed because allowance of that claim will result in overpayment. According to the Debtor, had there been no fraud, Glencove would have had to pay for these maintenance and repair costs anyway given Loretto's unwillingness to pay for them, so Glencove is getting a better deal with the fraud than without it. The Bankruptcy Court awarded damages in the amount of $29,947 for unperformed airworthy repairs, and concluded they were recoverable

---

[92] *Wagner*, 529 P.2d at 659 (citing *Stamp*).

[93] *Moore & Co. v. T-A-L-L, Inc.*, 792 P.2d 794, 799 (Colo. 1990) ("In light of the broker's fiduciary duty to the principal . . . it has long been the law in this state that the broker's concealment from the principal of information that bears upon the transaction in question will defeat the broker's claim for compensation.").

because the Debtor misled Glencove into closing. We agree with the Bankruptcy Court. The Pierces, through Glencove, thought they were buying an airworthy airplane. The Debtor actively misled them, and they did not get an airworthy airplane. It would take $29,947 to get the Airplane up to what they thought they were buying, and that damage amount is what is required to make Glencove whole from the Debtor's fraud. In addition, the Debtor's argument shifts the risk to Glencove of paying for repair costs that Loretto might have agreed to pay to close the transaction had there been no fraud. As noted above, "[t]he trial court, as trier of fact, has wide discretion in fixing the measure and amount of damages."[94] Under the circumstances, we find that the Bankruptcy Court did not abuse that discretion.

None of the Bankruptcy Court's findings related to damages are clearly erroneous or constitute an abuse of discretion.

For all of the reasons described above, the Bankruptcy Court did not err by allowing the Claim based on the Debtor's fraud.

### 3.     *Glencove proved the elements of fraudulent concealment*

To establish a fraudulent concealment claim under Colorado law, a plaintiff must show:

> (1) the defendant's concealment of a material existing fact that in equity or good conscience should be disclosed, (2) the defendant's knowledge that the fact is being concealed, (3) the plaintiff's ignorance of the fact, (4) the

---

[94] *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994) (citing *Bigler v. Richards*, 377 P.2d 552, 553 (Colo. 1963)).

37

defendant's intent that the plaintiff act on the concealed fact, and (5) the plaintiff's action on the concealment resulting in damage.[95]

The elements of a fraudulent concealment claim are similar to the elements of a fraud-by-misrepresentation claim, except that fraudulent concealment is a tort of omission—that is, the defendant fraudulently concealed material facts. "To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must thus show that the defendant had a duty to disclose the material information."[96] "Whether a defendant has a duty to disclose a particular fact is a question of law."[97]

The Bankruptcy Court found that the Debtor concealed several material facts, knowing that the facts were concealed and intending Glencove to act on them, all as part of the same fraudulent scheme to pocket $250,000 at Glencove's expense. Those concealed facts include (to name a few): the identity of the true seller of the Airplane (Loretto), the amount of Loretto's counteroffer, the status of actual purchase-price negotiations with Loretto, and the extent of required aircraft maintenance charges for the Airplane. None of these findings are clearly erroneous.

The Bankruptcy Court then determined that the Debtor had a duty to disclose the material facts for at least two independent reasons.

---

[95] *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1385 (Colo. App. 1990).

[96] *Rocky Mountain Expl., Inc v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018).

[97] *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991); *Berger*, 795 P.2d at 1383.

a)    **The Debtor had a fiduciary duty to disclose the concealed facts because he was Glencove's agent**

First, the Bankruptcy Court concluded that the Debtor was Glencove's agent and thus had a fiduciary duty to disclose the concealed facts to Glencove. For the reasons already detailed above, the Bankruptcy Court's agency finding is not clearly erroneous. And the Bankruptcy Court did not err in its related legal conclusion that the agency relationship gave rise to a fiduciary duty to disclose the concealed facts.

b)    **The Debtor had a duty to disclose the concealed facts based on the objective circumstances**

Second, the Bankruptcy Court determined that the Debtor—even if he were not Glencove's agent—had a duty to disclose the concealed facts because of the relationship between the parties, the customs of the trade, and other objective circumstances.[98] As the Bankruptcy Court found, the Debtor communicated with Glencove extensively and led Glencove and the Pierces to believe he was acting on Glencove's behalf. The Debtor also made many affirmative statements to Glencove regarding pricing, negotiations, repairs, and other terms that he knew would create a false impression. "[A] party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed."[99] The Bankruptcy Court also relied on the expert testimony from both sides and the related industry-customs evidence to conclude that the following industry standards apply to aircraft brokers like the Debtor: (1) aircraft brokers should not lie to their clients;

---

[98] *See Burman*, 821 P.2d at 918 (noting that in a business transaction, a duty to disclose may still arise because of the relationship between the parties, the customs of the trade, or other objective circumstances).

[99] *Id.*; *Berger*, 795 P.2d at 1383.

(2) aircraft brokers should disclose pertinent facts to their clients; and (3) aircraft brokers should not deceive their clients for their own gain.[100]

The Bankruptcy Court did not err in concluding that the Debtor had a duty to disclose the concealed facts under these circumstances, including the false impressions the Debtor left with his multiple affirmative misrepresentations.[101]

For all of the reasons described above, the Bankruptcy Court did not err by allowing the Claim based on the Debtor's fraudulent concealment.

### 4.     The Debtor's economic-loss argument fails

The Debtor next argues that he is free from liability for his fraud and fraudulent concealment due to Colorado's economic-loss rule. The Bankruptcy Court did not err in rejecting that argument.

Under Colorado's economic loss rule, adopted by the Colorado Supreme Court in *Alma* in 2000, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."[102] The *Alma* court concluded that the rule barred a negligence claim because the negligence claim was based solely on the breach of a contractual duty

---

[100] *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366, 401 (Bankr. D. Colo. 2020).

[101] Because the Debtor had a duty to disclose the concealed facts—separate and apart from agency law—the court's agency determination simply gives rise to a separate, alternative ground to affirm the Debtor's liability for fraudulent concealment.

[102] *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).

resulting in purely economic loss. Colorado's economic-loss rule was adopted out of concern for imposing both contract and tort liability for the same economic injury.[103]

After *Alma*, some lower Colorado courts—*Hamon Contractors*, *Former TCHR*, and *Walker*—applied the economic-loss rule to bar intentional torts as well, reasoning that the common law duties to refrain from fraud and to disclose material facts arose from and were expressly described by the parties' contract or were subsumed within that contract's implied covenant of good faith and fair dealing.[104]

The Colorado Supreme Court recently revisited the economic-loss rule in *Bermel* and held that the rule does not bar a statutory civil theft claim.[105] The court was concerned that interpreting the economic-loss rule—a judicially created doctrine—to bar a statutory claim would undermine separation-of-powers principles.[106] But in reviewing its own case law on the economic-loss rule, the court pointed out that it had previously only applied the economic loss rule "to bar common law tort claims of negligence or negligent

---

[103] *Id.* at 1262.

[104] *See, e.g., Top Rail Ranch Estates, LLC v. Walker*, 327 P.3d 321, 329 (Colo. App. 2014) (concluding that economic-loss rule barred fraud claims because plaintiffs' claim for breach of the implied duty of good faith and fair dealing duplicated their fraud claims); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232 (Colo. App. 2012) (holding that the economic-loss rule barred fraud and concealment claims because they did not arise out of an independent duty); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 289 (Colo. App. 2009), *as modified on denial of reh'g* (June 11, 2009) (concluding that the "economic loss rule can apply to fraud or other intentional tort claims based on post-contractual conduct").

[105] *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1159 (Colo. 2019).

[106] *Id.* at 1157-58.

41

misrepresentation."[107] The court then made these footnoted comments that two post-

*Bermel* Colorado opinions found significant:

> Although our cases have emphasized the need to "prevent tort law from 'swallowing' the law of contracts," *Alma*, 10 P.3d at 1260, we have been equally clear that we must also "be cautious of the corollary potential for contract law to swallow tort law," *Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, ¶ 19, 373 P.3d 603, 608. Defining the proper balance between these two areas of law is not the task before us today, but we note that *deference to private ordering must sometimes yield to the law's interest in compensation and redress for wrongful, injurious conduct*. To the extent the economic loss rule treats parties' assumption of contractual duties as disclaimers of their existing obligations in tort, it should be applied with some of the circumspection with which we have approached other exculpatory agreements. *See Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981) ("An exculpatory agreement, which attempts to insulate a party from liability from his own negligence, must be closely scrutinized...."). And just as we have held that "[u]nder no circumstances will an exculpatory agreement be permitted to shield against a claim of willful and wanton negligence," *McShane v. Stirling Ranch Prop. Owners Ass'n, Inc.*, 2017 CO 38, ¶ 20, 393 P.3d 978, 983, *we note that the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation*. (emphasis added).[108]

Two courts in Colorado—one state and one federal—relied heavily on this *Bermel*

language to conclude that the economic-loss rule does not bar fraud claims. First, the

Colorado Court of Appeals in *McWhinney* held that the economic-loss rule did not bar a

party's common law intentional tort claims of fraudulent concealment, intentional

interference with contractual obligations, and intentional inducement of breach of contract

because each of these claims stems from a duty based in tort law independent of the

---

[107] *Id.* at 1155.

[108] *Id.* at 1154 n. 6 (emphasis added).

agreement. "While the conduct underlying each of these claims may also support a breach of contract claim in this case, we are not persuaded that the economic loss rule should 'shield intentional tortfeasors from liability for misconduct that happens *also* to breach a contractual obligation.'"[109] The court refused to follow its pre-*Bermel* interlocutory decision to the contrary, and it declined to follow *Hamon Contractors*, *Former TCHR*, and *Walker*, because it concluded that *Bermel* substantially altered the application of the economic-loss rule in Colorado.[110]

The federal district court in *Western State Bank* likewise concluded that under *Bermel*, the economic-loss rule did not bar a bank's fraud claim.[111] The court learned from *Bermel* that "in determining whether the economic loss rule should bar a claim, courts should differentiate between unintentional and intentional torts."[112]

The Debtor argues that footnote 6 in *Bermel* is mere dicta and that the economic-loss rule still bars Glencove's fraud and fraudulent-concealment claims. The Debtor's argument fails for two independent reasons.

---

[109] *McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen Lifestyle Centers-Centerra LLC*, 486 P.3d 439, 454–55 (Colo. App. 2021) (quoting *Bermel*), *reh'g denied* (Feb. 4, 2021). On the other hand, the court concluded that the economic-loss rule barred a contracting party's civil conspiracy claim because the other party's duty not to conspire to breach the contract stemmed solely from the contract itself. *Id.* at 455.

[110] *Id.* at 453, 455.

[111] *W. State Bank v. Cosey, L.L.C.*, No. 19-cv-01155-JLK, 2019 WL 5694271, at *4 (D. Colo. Nov. 4, 2019).

[112] *Id.* The court held, in the alternative, that even if the economic-loss rule barred tort claims after *Bermel*, the rule did not apply to (and thus did not bar) the intentional fraud claim, which was based on pre-contractual misrepresentations and omissions. *Id.* at *4-5.

43

First, Glencove is not a party to any contract with the Debtor, and there is no other contract governing the Debtor's duties, so the economic-loss rule—which in some instances may bar a party's tort claim when that party suffers only economic loss from the breach of a contractual duty—simply does not apply. The Colorado Court of Appeals in *Rhino* came to the same conclusion, holding that the economic-loss rule did not bar an investor from suing an investment fund owner for conversion and civil theft where the owner had diverted proceeds that were required, by the contract between the investment fund and the investor, to be placed in escrow to secure repayment of the investor's loan: "But here, Rhino [the investor] has no contractual remedy against Hutchins [the fund owner] for his conversion and civil theft because the contract was entered into by All Terrain [the fund] and Rhino."[113]

The Debtor cites *Former TCHR* and *Walker*, two other pre-*Bermel* Colorado Court of Appeals decisions that applied the economic-loss rule to bar claims against non-contracting officers, directors, or owners.[114] In reaching this conclusion, *Walker* cited

---

[113] *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. App. 2008), *as modified on denial of reh'g* (Dec. 24, 2008).

[114] *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232 (Colo. App. 2012) ("When the economic loss rule bars a claim against a corporate entity, it *may* also bar claims against that entity's officers and directors, even if the officers and directors were not parties to the contract at issue. For example, such claims may be precluded when the officers' and directors' duties, rights, obligations, or liabilities arise from the contract between the corporate entity and another.") (citation omitted and emphasis added); *Top Rail Ranch Estates, LLC v. Walker*, 327 P.3d 321, 329 (Colo. App. 2014) ("We reject the argument posed by Top Rail and Jenkins that their fraud claims against Walker individually cannot be barred by the economic loss rule because Walker was not a party to the contract. This fact is inconsequential for purposes of the economic loss rule because he is a member of Walker Development.") (citing *Former TCHR*).

*Former TCHR*, and *Former TCHR* in turn cited the Colorado Supreme Court *BRW* opinion.[115] But a close examination of *BRW* reveals why the rule announced there does not help the Debtor.

Dufficy & Sons, Inc., a second-tier steel subcontractor on a public-works bridge project, brought an action for negligence against the engineering firm (BRW) that designed the bridge and against BRW's subcontractor, PSI, retained to inspect the project's construction, alleging that improper plans and inadequate inspections caused cost overruns. The Colorado Supreme Court held that the economic-loss rule barred the negligence claims even though the plaintiff had no contract with the defendants. The Supreme Court first pointed out that the construction project involved a "network of agreements of which all parties had notice" among "commercially sophisticated parties [who were] able to negotiate and bargain for an allocation of risks, duties, and remedies" relating to the construction project.[116] The Supreme Court concluded that the "interrelated contracts in this case" contain the defendants' respective duties of care to the plaintiff.[117] Specifically, the plaintiff had the opportunity to allocate the risks relating to its work on the project when it entered into a contract with another party involved in the network of contracts, including its risks relative to the defendants.[118] So even though there was no privity of contract between the plaintiff and defendants, the Colorado Supreme Court concluded that "the

---

[115] *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66 (Colo. 2004).

[116] *Id.* at 73.

[117] *Id.* at 74.

[118] *Id.* at 69, 72.

duties allegedly breached were contained in the network of interrelated contracts, and [thus] the economic loss rule applies."[119]

In contrast, this case does not involve a network of interrelated contracts among commercially sophisticated parties that spell out and limit the Debtor's individual duties to Glencove.[120] The *BRW* rationale for extending the economic-loss rule to a defendant whose duties to the plaintiff are defined and limited by a network of interrelated contracts does not apply here.

Second, even if the economic-loss rule could theoretically protect a party with no contractual duties whatsoever, the rule does not protect the Debtor from his intentional torts. Although the Colorado Supreme Court's comments in footnote 6 of *Bermel* may be dicta, it is "considered dicta" that signals the court's unwillingness to protect intentional fraudsters with a court-made doctrine. Not only did the *Bermel* court note its prior limited application of the economic-loss rule to negligence claims, but it also emphasized that the rule should not shield intentional tortfeasors from liability simply because the misconduct also happens to breach a contract. *Bermel* footnote 6 appears to be a reliable indicator that the Colorado Supreme Court would not apply the economic-loss rule to bar intentional tort claims. Like the Colorado courts issuing post-*Bermel* decisions, this Court concludes that

---

[119] *Id.* at 74.

[120] The Bankruptcy Court found instead that the parties created an agency relationship through their conduct.

the economic-loss rule does not bar Glencove's fraud and fraudulent-concealment claims against the Debtor.[121]

The Debtor attempts to save his economic-loss-rule defense by suggesting that this Court is bound by *Spring Creek*, a pre-*Bermel* 2018 Tenth Circuit decision holding that a contracting party's fraudulent-concealment claim was barred by Colorado's economic-loss doctrine.[122] As that court noted, however, "In the absence of a definitive resolution of a legal issue by that court, our task is to predict how the Colorado Supreme Court would rule."[123] *Spring Creek* is not binding precedent[124] given the most recent pronouncements by the Colorado Supreme Court in *Bermel* and the Colorado Court of Appeals post-*Bermel* ruling in *McWhinney*.[125]

---

[121] *See W. v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("True, as was intimated in the Erie Railroad case, the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted."); *Florom v. Elliott Mfg.*, 867 F.2d 570, 580 (10th Cir. 1989) ("We agree that in making a prognostication of what the highest state court will decide, the decisions of lower state courts and other federal courts are of 'somewhat less importance' than even considered dicta by the state's 'highest court.'") (citing *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980); *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980) ("Considered dicta by the state's highest court may also provide a federal court with reliable indicia of how the state tribunal might rule on a particular question.").

[122] *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1020-22 (10th Cir. 2018), *as revised* (Apr. 13, 2018).

[123] *Id.* at 1021.

[124] *Spring Creek* is not binding for the additional reason that it did not involve a defendant (like the Debtor) with no contractual obligation whatsoever, as discussed above.

[125] *Cf. Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1231 (10th Cir. 2000) ("Following the doctrine of *stare decisis*, one panel of this court must follow a prior panel's interpretation

For these reasons, the Bankruptcy Court did not err in concluding that the economic-loss rule does not bar Glencove's fraud and fraudulent-concealment claims against the Debtor.

**B.     The Bankruptcy Court did not err by determining that the Debtor's debt for Glencove's Claim is nondischargeable under § 523(a)(2)(A) and (a)(6)**

The Bankruptcy Court determined that the Debtor's debt for Glencove's claim is nondischargeable under § 523(a)(2)(A) and (a)(6). For the reasons described below, the Bankruptcy Court did not err in that determination.

### 1.      *Glencove proved the elements of § 523(a)(2)(A)*

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[126] On appeal, the Debtor does not appear to raise any new arguments concerning his fraudulent conduct other than those addressed above regarding fraud and fraudulent concealment, except the Debtor argues that he is free from liability for his fraud because he did not *directly* obtain any Airplane sale proceeds.

---

of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law."). Other Tenth Circuit panels have used more restrictive language, suggesting that the intervening authority must come from the state court's highest court. *See Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (noting that a prior Tenth Circuit decision interpreting state law is binding on district courts in the circuit unless an intervening decision of the state's highest court has resolved the issue; also noting that "[t]he federal court must defer to the most recent decisions of the state's highest court.").

[126] 11 U.S.C. § 523(a)(2)(A).

### a)    Glencove proved false representation under § 523(a)(2)(A)

For purposes of § 523(a)(2)(A), false representation requires showing that the debtor made a false representation with the intent to deceive a creditor, that the creditor justifiably relied on the representation, and that the creditor suffered damages as a result.[127] These elements are virtually identical to the elements required for establishing a cause of action for fraud by false representation under Colorado law (discussed above), except that § 523(a)(2)(A) requires "justifiable reliance" instead of "reasonable reliance."[128] Reasonable reliance is an objective standard based upon whether a reasonable person would have relied on the alleged false representations.[129] Justifiable reliance is a less demanding, subjective standard that focuses on the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases.[130]

As detailed above, the Bankruptcy Court found that the Debtor made numerous false representations with the intent to deceive Glencove, that Glencove actually and reasonably relied on the representations, and that Glencove suffered damages as a result. The Bankruptcy Court also found, for purposes of § 523(a)(2)(A), that Glencove justifiably relied on the Debtor's false representations given the relative aircraft experience of the parties and the Debtor's various words and actions. That finding is not clearly erroneous.

---

[127] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. BAP 2013).

[128] *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

[129] *Id.* at 70-72.

[130] *Id.* at 70-72.

For these reasons, the Bankruptcy Court's findings that Glencove proved false representation under § 523(a)(2)(A) are not clearly erroneous.

### b) Glencove proved false pretenses under § 523(a)(2)(A)

False pretenses under § 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression.[131] Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions.[132] False pretenses include "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[133]

The Bankruptcy Court found that the Debtor purposefully concealed several material facts, intending Glencove to act on them, all as part of his fraudulent scheme to flip the Airplane and pocket $250,000 at Glencove's expense. As noted earlier, those concealed facts include the identity of the true seller of the Airplane (Loretto), the amount of Loretto's counteroffer, the status of actual purchase-price negotiations with Loretto, and the extent of required aircraft maintenance charges for the Airplane. That conduct, coupled with the associated damages already discussed in connection with Glencove's Proof of Claim, led the Bankruptcy Court to find that the Debtor's debt to Glencove is nondischargeable under the false-pretenses component of § 523(a)(2)(A). None of those findings are clearly erroneous.

---

[131] *In re Sturgeon*, 496 B.R. at 223.

[132] *Id.* at 223.

[133] *Id.*

### c)     Glencove proved actual fraud under § 523(a)(2)(A)

Actual fraud under § 523(a)(2)(A) means fraud that involves moral turpitude or intentional wrong and not mere constructive or implied fraud.[134] Actual fraud occurs when a debtor intentionally engages in a scheme to deprive or cheat another person of property or a legal right.[135] Fraudulent intent may "be shown by establishing that the debtor was a willing participant in a fraudulent scheme and thereby intended to deceive a creditor."[136] Actual fraud could involve misrepresentations, but misrepresentations are not required for actual fraud.[137]

After making extensive findings regarding the Debtor's multiple false representations and concealed facts, the Bankruptcy Court minced no words:

> The Court's findings lead to no other conclusion than that Mr. Bloom engaged in a very brazen fraudulent scheme certain to damage Glencove. The fraud he perpetrated involved moral turpitude and intentional wrong. What Mr. Bloom did was deception and trickery in its most devious form. Indeed, Mr. Bloom's actions were the very architype of actual fraud. As a result, Glencove met its burden to prove that the Debt is nondischargeable by reason of actual fraud under Section 523(a)(2)(A).[138]

The Bankruptcy Court's findings that Glencove proved actual fraud under § 523(a)(2)(A) are not clearly erroneous.

---

[134] *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016).

[135] *In re Sturgeon*, 496 B.R. at 223.

[136] *Id.*

[137] *Husky*, 136 S. Ct. at 1587-88.

[138] *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366, 434-35 (Bankr. D. Colo. 2020).

#### d)    The Debtor's *Cohen* argument fails

Citing *Cohen v. De La Cruz*,[139] the Debtor argues that he is free from liability for his fraud because he did not *directly* obtain any Airplane sale proceeds, which were distributed to IATS (the airplane title company), Big Horn, Brad Rose (the Debtor's attorney and co-manager of Big Horn), Haggan, and BBJ (the Debtor's wholly owned company). If this were so, all a fraudster has to do to avoid liability under § 523(a)(2)(A) is set up a wholly owned LLC (like Big Horn or BBJ) to receive the proceeds of the fraud, and the debtor is off the hook. The Debtor's argument is without merit.

In *Cohen*, the Supreme Court addressed whether § 523(a)(2)(A) discharged all liability arising from a debtor's underlying fraud, including treble damages assessed on account of fraud under state law as well as an award of attorney's fees and costs. The Supreme Court explained, "Once it is established that specific money or property has been obtained by fraud," any debt arising from that fraud—including treble damages and attorney's fees—is excepted from discharge.[140] The Debtor latches onto *Cohen*'s phrase "has been obtained" to contend that § 523(a)(2)(A) does not apply unless he personally and directly received specific money, property, services, or credit.

The Supreme Court in *Cohen* did not address whether a debtor must *receive* specific money, property, services, or credit before a debt on account of the fraud can be found nondischargeable under § 523(a)(2)(A). The circuit courts of appeal that have grappled

---

[139] 523 U.S. 213 (1998).

[140] *Id.* at 218-19.

with this issue—while sometimes interpreting the provision differently—have all rejected

the argument that a debtor must directly receive a benefit from the fraud before the related

debt is nondischargeable.[141] The Eleventh Circuit's rejection of the argument is apt:

> [G]ranting a debtor a discharge based solely on the fact that he or she did not *directly* receive a benefit places a limitation on § 523 that is not apparent from the text of the provision itself. Moreover, such a limitation would provide a dangerous incentive for the sophisticated debtor, who could circumvent the provision by creating a shell corporation to receive the fruits of his or her fraud. As we have previously stated, we will not allow "the malefic debtor [to] hoist the Bankruptcy Code as protection from the full consequences of fraudulent conduct."[142]

This Court has no trouble concluding that the Debtor's debt to Glencove was

"obtained" by the Debtor's fraud. As discussed above in detail, Glencove proved a

sufficient causal connection between the Debtor's fraud and the injury and damages

Glencove suffered as a result. The Debtor cannot escape liability under § 523(a)(2)(A) by

secretly using his shell company, Big Horn, to perpetrate the fraud, and another of his

---

[141] Those courts sometimes employ different analyses, under different facts, to reach that conclusion. *See, e.g.*, *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 751 (5th Cir. 2001) ("[W]e hold that § 523(a)(2)(A) prevents an innocent debtor from discharging liability for the fraud of his partners, regardless whether he receives [directly or indirectly] a monetary benefit."); *HSSM #7 Ltd. P'ship v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 890 (11th Cir. 1996) (rejecting narrow view that debtor must personally receive the fruits of the fraud; adopting "receipt of benefits" theory, requiring that the debtor obtain a benefit—direct or indirect—from the money that was obtained by fraudulent means); *Boston Mtg. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1561-62 (6th Cir. 1992) (concluding that § 523(a)(2)(A) prevents innocent debtor from discharging liability for the fraud of his partner, when facts showed that debtor benefitted indirectly from the fraud because the fraudulently obtained funds were used for a condominium project from which debtor stood to profit as a partnership partner).

[142] *In re Bilzerian*, 100 F.3d at 891 (citing *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993), *as corrected on reh'g* (June 22, 1993)).

companies, BBJ, to be the direct recipient of the benefits of his deceitful conduct. This Court follows the Eleventh Circuit's lead and concludes that § 523(a)(2)(A) bars the discharge of the Debtor's debt to Glencove even though the Debtor did not directly receive the fruits of his fraud. The statute does not use the term "received." Subsection (2) of § 523(a) uses the passive tense to provide that a debt is excepted from discharge "to the extent obtained by . . . (A) false pretenses, a false representation, or actual fraud" (with an exception not applicable here). *Cohen* noted that "[t]he Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'"[143] The evidence is overwhelming that the Debtor is not an honest but unfortunate debtor. The text and purpose of § 523(a)(2)(A) both support denying the discharge of his debt to Glencove.

### 2.     *Glencove proved the elements of § 523(a)(6)*

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."[144] On appeal, the Debtor argues that the elements of § 523(a)(6) were not proven below.

Proof of a willful and malicious injury requires proof that the injury be both willful *and* malicious.[145] For an injury to be willful, there must be a deliberate or intentional injury,

---

[143] *Cohen*, 523 U.S. at 217 (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

[144] 11 U.S.C. § 523(a)(6).

[145] *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020).

not merely a deliberate or intentional act that leads to injury.[146] Willful injury may be established by direct evidence of specific intent "or by indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur. This is a subjective standard."[147] To determine whether an injury is malicious, the court must review all the surrounding circumstances, including any justification or excuse offered by the debtor, to determine if the debtor's actions were wrongful.[148]

In its Opinion, the Bankruptcy Court meticulously chronicled the Debtor's brazen lies related to the maintenance and purchase of the Airplane. The Bankruptcy Court—after clearly articulating and considering the standards under § 523(a)(6)—had little trouble finding that the Debtor willfully and maliciously injured Glencove. Those findings are not clearly erroneous.

The Debtor makes four primary arguments to avoid liability under § 523(a)(6), none of which are persuasive. First, the Debtor argues that his actions were not willful or malicious (or as he calls it, tortious), but instead were more akin to a knowing breach of contract, which the Supreme Court said could involve a situation where an act is intentional, but injury is unintended.[149] As the Bankruptcy Court pointed out, however, the Debtor—through his multiple, intentional lies—specifically intended to injure Glencove by, for example, causing Glencove to pay $250,000 more for the Airplane than it should

---

[146] *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998)).

[147] *In re Smith*, 618 B.R. at 912.

[148] *Id.*

[149] *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998)).

have so that the Debtor could benefit himself instead (indirectly) by lining the pockets of his wholly owned limited liability company and his associates. The Bankruptcy Court's finding that the Debtor acted willfully and maliciously is not clearly erroneous.

Second, the Debtor argues that Glencove was not injured within the meaning of § 523(a)(6) because it purchased the Airplane for fair market value. As discussed above, Glencove's injury has nothing to do with fair market value. Glencove was injured because the Debtor intentionally misrepresented the actual price Loretto was willing to accept for the Airplane, whether that was at, below, or above fair market value. But even if Glencove's injury were somehow tied to fair market value, Glencove paid $3.55 million for an Airplane that—as explained above—had a fair market value of $3.3 million. The Bankruptcy Court's finding that the Debtor injured Glencove is not clearly erroneous.

Third, the Debtor argues that the Bankruptcy Court did not properly consider evidence in the record that the Debtor claims provides a justification for his misdeeds.[150] But the existence of contrary evidence does not render a finding of fact clearly erroneous.[151] "It is the bankruptcy court's job to consider all of the evidence and to render findings, and it is particularly within the purview of the factfinder to make determinations of credibility and the weight to be given the evidence."[152] Indeed, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly

---

[150] Appellant Br. at 35-37.

[151] *In re Muth*, 514 B.R. 719, 2014 WL 1712527, at *6 (10th Cir. BAP May 1, 2014) (unpublished).

[152] *Id.*

erroneous."[153] The Bankruptcy Court considered the Debtor's evidence and evidently gave it little weight. The Bankruptcy Court's finding that the Debtor acted maliciously is not clearly erroneous.

Finally, the Debtor argues that the Bankruptcy Court erred by excluding evidence[154] that the Debtor claims provides a justification for his misdeeds:

- The Bankruptcy Court, on relevancy grounds, excluded the second page of the Debtor's Exhibit ED,[155] a timeline of events prepared by AFC that the Debtor offered to establish the difficulties encountered by the Pierces and Glencove in securing financing. According to the Debtor, the document allegedly reinforced the Debtor's belief that the back-to-back structure and "upcharge" were justified by the risk Glencove would be unable to close on the sale of the Airplane.

- The Bankruptcy Court excluded the Debtor's Exhibit DU,[156] an Airplane appraisal, on the basis that the document was opinion testimony from the Debtor, who was not admitted as an expert in the case and not identified as an expert. According to the Debtor, the appraisal was not offered to prove the value of the Airplane, but instead to show the Debtor's state of mind and whether he believed the back-to-back structure and "upcharge" would injure Glencove.

The Bankruptcy Court did not abuse its discretion in excluding either document. First, it is difficult to see how the AFC timeline—which allegedly showed Glencove's difficulties in securing financing—would be relevant to excusing the Debtor's repeated blatant lies to Glencove concerning the Airplane purchase and maintenance. The document

---

[153] *Id*. (citing *Lone Star Steel Co. v. United Mine Workers of Am*., 851 F.2d 1239, 1242 (10th Cir. 1988)).

[154] June 22, 2020 Hr'g Tr., *in* Appellant's App. at 242-46 (excluding BBJ appraisal); June 23, 2020 Hr'g Tr., *in* Appellant's App. at 556-62 (excluding AFC timeline).

[155] *Exhibit ED* at 2, *in* Appellant's App. at 1426.

[156] *Exhibit DU*, *in* Appellant's App. at 1413.

was irrelevant. And second, the Debtor did not need the Airplane appraisal to testify about whether he thought the back-to-back structure and "upcharge" would injure Glencove. The document was properly excluded as opinion testimony from an undesignated expert.

Even if the Bankruptcy Court somehow erred in excluding either document, no substantial right of the Debtor is affected, and thus there is no reversible error, because the documents do not add anything of probative value beyond the admitted evidence and would not have changed the outcome of trial. With respect the AFC timeline, Orman of AFC already testified about Glencove's troubles in obtaining financing,[157] so the timeline was duplicative of his testimony. And the Debtor testified about why he thought the back-to-back structure and "upcharge" were appropriate,[158] so the Airplane appraisal—to the extent offered for that purpose—was duplicative of the Debtor's testimony.

For all of these reasons, the Bankruptcy Court did not err in determining that the Debtor's debt for Glencove's Claim is nondischargeable under § 523(a)(2)(A) and (a)(6).

## VI.     CONCLUSION

The Debtor took aviation fraud to new heights with his lies and deceit, but his arguments on appeal never really took off. The Bankruptcy Court's Judgment allowing the Claim and declaring the Debtor's associated liability nondischargeable is **AFFIRMED**. The Motion to Exclude is **DENIED**.

---

[157] June 23, 2020 Hr'g Tr., *in* Appellant's App. at 554-56.

[158] *See, e.g.,* June 24, 2020 Hr'g Tr., *in* Appellant's App. at 790-93, 796-97.